EMMETT E. MOSS *vs.* ROCKY POINT PARK, INC.

FEBRUARY 19, 1954.

PRESENT: Flynn, C. J., Baker, Condon and O'Connell, JJ.

FLYNN, C. J.   This action of trover and conversion was tried to a jury in the superior court and a verdict was returned for the plaintiff in the sum of $3,500.   Thereafter the trial justice denied the motion of the defendant corporation for a new trial, and the case is here on its exception to that decision and to other rulings made during the trial.

The plaintiff, who was a resident of the state of Ohio, filed a declaration in two counts alleging in substance that he was sole owner and entitled to the possession of a Tumblebug ride which was located on the premises of Rocky Point amusement park in the city of Warwick in this state; that defendant, a Rhode Island corporation, was the owner and operator of said park on November 17, 1947; and that on or about that date defendant converted the Tumblebug ride by selling it to a third party for $9,000.   The defendant filed pleas of the general issue and also special pleas setting up respectively plaintiff's abandonment of the ride, laches, adverse possession, the statute of limitations, estoppel, and that the ride was not personal property but had become a part of the realty purchased by defendant.

The following facts appear in evidence and are sufficient for an understanding of the controversy and rulings.   The plaintiff purchased the Tumblebug ride in 1927 from a

Pennsylvania manufacturer for $13,500, and had paid for it in full before this action was brought. In 1928, after having operated it for a brief time on Long Island, New York, plaintiff brought it to Rocky Point amusement park. There it was set up and operated for several years by plaintiff and his partner, doing business as Gowell Amusement Company, under an agreement whereby the owner or operator of the park accepted 25 per cent of the gross receipts as rental for permission to operate it.

The ride itself consisted of a metal center spindle and steel arms radiating therefrom to a single rail on which six cars of steel were rotated or propelled by central motors and machinery. It could be manually assembled and dismantled by the use of nuts and bolts. The center spindle was anchored in a cement block or pier which was sunk 10 feet into the ground and the steel radiating arms rested upon some thirty or forty smaller piers sunk only two feet into the ground at strategic places. The area covered was 300 feet in circumference.

In 1938 the ride was sold by the city of Warwick for accrued and unpaid personal property taxes assessed against the Gowell Amusement Company and it was purchased by plaintiff. He continued individually to operate the ride on said rental basis until 1942 when because of war conditions the park ceased to open and operate. The plaintiff then stored the motors with R. L. Derouin, doing business as West Warwick Machine Company, who had done plaintiff's electrical maintenance work, and by permission of the then owner left the ride itself on the park grounds.

Apparently in 1942 the park was sold and conveyed by deed of Randall A. Harrington to Studley Land Company. The plaintiff, who had kept in touch with general conditions affecting the ride and park, personally came from Ohio in 1946 to investigate the possibility of the park being reopened, at which time he inspected the ride and patched up some loose boards to prevent possible accidents to chil-

dren. From such inspection and his experience with the purchase and operation of the ride, he estimated that to get it into operation would require an expenditure of $1,200 to $1,500, specifying different items that required parts and repairs. He further testified that if the park were reopened and doing a good business, the value of the ride as thus repaired would be $7,000 or $8,000. On the other hand there was testimony for defendant to the effect that at the time it was worth only $500.

Thereafter, by deed of August 6, 1947, Studley Land Company conveyed the park to the defendant corporation. The latter deed, which is in evidence, purported to convey by description the land known as Rocky Point amusement park, "Together with all the buildings and improvements thereon," excepting therefrom certain designated stands or concessions. That list of exceptions did not include the Tumblebug.

After such purchase plaintiff was notified by defendant to take the ride out of the park. Following this notice, plaintiff and his Ohio attorney negotiated by letters, telegrams and telephone calls with defendant through its president Fred Hilton concerning plans for reopening the park, the opera-tion of the ride by plaintiff, and the rental defendant would accept. In these negotiations defendant asked for a flat rental of $3,000 annually, while plaintiff offered to pay 25 per cent of the gross receipts as previously agreed to by the former owner and operator. After failing to agree on the terms of rental, defendant for the first time claimed ownership thereof by virtue of its purchase and deed of the land together with the buildings and improvements thereon.

Thereafter, according to defendant, it caused certain repairs to be made on the ride as testified to by its agent Joseph Trillo. These included expenditures for materials and parts, painting, carpentry work, construction and repair of fences, storage for the motors, electrical work, and design-

ing, amounting in all to approximately $5,000. This sum included the price of $300 which defendant admittedly had paid to plaintiff after negotiating for the purchase of the motors stored at the West Warwick Machine Company, and after plaintiff and his agent Derouin had made clear to defendant that plaintiff was selling only the motors and not the ride itself.

On or about November 17, 1947 the ride as thus repaired was sold by defendant for $9,000 to Louis Covinsky, who also agreed to pay a minimum of $3,000 annually for permission to operate it in the park. When it appeared that two of the six cars were not in usable condition, an allowance of $500 was made by defendant so that the ride actually was sold for $8,500, which was paid to defendant by Covinsky. The latter testified in substance that he was inexperienced at that time in operating a Tumblebug; that defendant had offered to sell it to him for $3,000 to $3,500 *as it was*, he to do his own repairing; and that because he desired to acquire the ride in operating condition from a responsible person who understood its repairs, he preferred and agreed to buy it for $9,000 after it was repaired. This offer to sell the ride "as it was" for the above price was denied by defendant, but admittedly in accordance with their agreement defendant repaired and sold the ride to Covinsky for $9,000, which was adjusted to $8,500. He operated it in the park on defendant's terms of a minimum rental until he sold it to another person.

The defendant's bill of exceptions containing twenty exceptions is argued under twelve points, some of them being grouped as they involve the same contention or principle of law. The first point relates to the allowance of testimony by the witness Covinsky concerning defendant's offer to sell the ride for $3,000 to $3,500 before it was repaired. The defendant claims that a mere unaccepted offer was not proper evidence of the value of the ride at the time of conversion. In our opinion this testimony must

be taken with other evidence and in the circumstances it was not to be considered merely as an unaccepted offer. The defendant also relies strongly on *National Cash Register Co. v. Underwood,* 56 R. I. 379, but the facts therein are distinguishable. In that case the court held that a price list prepared and intended by a company for the exclusive reference of its salesmen, and not in any way to be used as a price quotation to the public for actual sale, was not probative evidence of the value of that commodity in an open and competitive market.

The instant case is quite different. Here there was testimony of negotiations between a willing seller and buyer. The price stated was a firm offer to the buyer, as one of the public, for the purpose of making a sale of the ride "as it was" without any other qualification, and such offer nowhere appears to have been intended for the exclusive private use of the seller's own agents. The testimony, though not conclusive, when considered with other evidence was relevant as to the value of the ride at or about the time of conversion. In our opinion defendant's objection goes to the weight of the testimony rather than to its admissibility, and in any event, contrary to its argument, this was not the only evidence from which the value of the ride might have been inferred.

Points II, III, IV, V, VI, VII and VIII relate to rulings admitting certain letters, telegrams, or copies thereof. This evidence was largely corroborative, not primary, and much of it became relevant because of claims made by defendant's special pleas. As to certain copies, however, there appears to be irregularity in failing to lay a complete foundation but the error became harmless, since in later testimony for defendant the contents and truth of such communications are substantially admitted.

Likewise under point IX defendant takes nothing by its exception to the denial of its motion for a nonsuit. It is well established that such a denial is not a proper subject

for an exception. *Anderton* v. *Blais,* 28 R. I. 78; *Brison* v. *Frechette,* 78 R. I. 68, 72.

Points X, XI and XII raise the chief contention by defendant, namely, that the ride had been affixed to the realty in such a way as to become a part thereof, and that the deeds from Harrington to Studley Land Company and from Studley Land Company to defendant conveyed all the realty in Rocky Point amusement park, "Together with all the buildings and improvements thereon," which included the Tumblebug. For those reasons defendant argues that the action of trover lies only for possession of personal property or value thereof and not to recover realty; that all the evidence which plaintiff introduced concerning the value of the ride as personal property was therefore inadmissible; and that the trial justice's charge, his refusal of defendant's requests to charge and for special findings in that connection were therefore erroneous.

In our judgment the underlying fallacy of this contention is that it erroneously assumes the ride was affixed to the realty so as to become a permanent part thereof and therefore was conveyed by deed of the realty to defendant. The evidence shows that the ride was subject to assembly by nuts and bolts; that the cement center pier was used only as an anchorage for the central spindle; and that the ride could be dismantled and all the cement piers removed, if desired, without substantial damage to the land. There is no convincing evidence that plaintiff or any of the previous owners and operators of the park intended or ever considered that the ride was affixed as a permanent improvement to the land, and there is positive testimony to the contrary. In the circumstances, considering the intention of the parties and the nature of the ride, the only reasonable conclusion is that it was a trade fixture and therefore did not lose its identity as personal property. *Butler* v. *Butler's Diner, Inc.,* 81 R. I. 43, 98 A.2d 875.

The only other questions of general importance are defendant's contentions that there was no evidence of value at the time of conversion and that plaintiff is estopped from making a claim for the ride or its value after defendant in good faith had repaired it. We do not agree with these contentions. As to the first, it is conceded that there must be such evidence. See *Combination Fountain Co.* v. *Millard,* 50 R. I. 50. But there was testimony by plaintiff, Covinsky, and others bearing on the value of the ride before it was repaired, and from all the evidence the jury reasonably could, and apparently did, determine the value of the ride at the time of conversion.

As to defendant's contention that plaintiff should be estopped to claim the ride after standing by while defendant in good faith expended approximately $5,000 for repairs, the plain answer is that the jury did not award plaintiff the ride or the full value thereof. It appears that they were discriminating and consistent with their special findings in not giving plaintiff more than $3,500. Apparently they restricted their verdict substantially to the difference between the value he placed on the ride if repaired, namely, about $7,000 or $8,000, and the cost of repairs made by defendant, approximately $5,000, so far as such expenditures were found to be properly allocable to the ride; or to the difference between the price received, $8,500, and the total expenditures approximating $5,000. Since a portion of those expenditures was for designing in the whole park, and in building as permanent improvements fences and fronts at several other concessions or places elsewhere in the park, as clearly shown in the testimony, defendant was not entitled to a credit here for the full amount thereof. The verdict protected defendant in its claim for all proper expenditures, and perhaps some additional profit, out of the $8,500 it actually received for the sale of the ride, while plaintiff was reimbursed only for its reasonable value before

repairs, which was at or about the time of its conversion, thus doing justice between the parties.

Finally the defendant contends that it was error to deny its motion for a new trial. From our examination of the transcript we cannot say that the trial justice overlooked or misconceived any important evidence, or that he failed to exercise his independent judgment in approving the verdict as rendered. In the circumstances, therefore, we cannot say that he was clearly wrong and the exception relating to this decision is overruled. The other exceptions which are neither briefed nor argued are deemed to be waived.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court for entry of judgment on the verdict.

*Haslam, Arnold, Anderson & Mullen, Stephen F. Mullen,* for plaintiff.

*Zietz & Sonkin,* for defendant.